# Exhibit A

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION**

| | |
|---|---|
| AMERICAN    FAMILY    INSURANCE COMPANY,<br><br>      Plaintiff,<br><br>v.<br><br>DIA SURI, LLC,<br><br>      Defendant. | Civil Action No.<br><br>4:18-CV-00181-WTM-GRS |

**DEFENDANT'S BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION TO EXCLUDE
TESTIMONY AND REPORT OF FRED BONNER**

COMES NOW, DIA SURI, LLC, the Defendant in the above-styled action, and by and through its undersigned counsel, THE CONNER LAW GROUP, P.C., respectfully files this DEFENDANT'S BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION TO EXCLUDE TESTIMONY AND REPORT OF FRED BONNER, and in support thereof states as follows:

**STATEMENT OF FACTS**

**I.      PROCEDURAL HISTORY.**

The Plaintiff, American Family Insurance Company, originally commenced this action by filing the Complaint for Declaratory Judgment on July 31, 2018, seeking a declaratory judgment that the insurance policy it provided to the Defendant, Dia Suri, LLC, does not provide coverage, or provides limited coverage for certain losses, namely Loss of Business Income and Loss of Sale. Doc. 1, pp. 1-9.  In response thereto, the Defendant filed its Verified Counterclaims and Answer to Amended Complaint for Declaratory Judgment on October 4, 2018.  Doc. 11.  The Defendant's claims arise out of covered property-damage claims resulting from Hurricane Matthew and arising

under an insurance policy provided by the Plaintiff.  More specifically, the Defendant made counterclaims for Loss of Business Income, Loss of Sale, Plaintiff's bad faith refusal to cover the Defendant's losses in accordance with GA. CODE ANN. § 33-4-6, attorneys' fees pursuant to GA. CODE ANN. §§ 13-6-11 and 33-4-6, and prejudgment interest pursuant to GA. CODE ANN. § 7-4-15.  Doc. 11, pp. 13-29.

## II.   THE CLAIMS PROCESS.

The Defendant owns the subject real property located at 155 Bourne Avenue, Pooler, Georgia 31322 (the "Property").   Doc. 14, p. 3, ¶6; Deposition of Dia Suri, LLC's 30(b)(6) representative, Dhaval J. Desai, April 9, 2019 ("Dia Suri Depo."), 15:18-16-6.[1]  The Defendant operates a Best Western Plus hotel on the Property. Doc. 14, p. 3, ¶6; Dia Suri Depo., 15:18-16-6. On or about October 6, 2016, Hurricane Matthew damaged the Property, including the Best West Plus hotel. Doc. 14, p. 3, ¶10; Dia Suri Depo., 31:3-13.  The Defendant sought repair of and payment for damage that occurred during Hurricane Matthew under the Businessowners Policy GL, No. 10X25958-01 (the "Policy") issued by the Plaintiff.[2]  The Property was insured for $5,600,000.00 under the Policy.  Doc. 7-1, p. 11.  The Policy had wind and hail deductible in the amount of one percent of (1.00%) of the policy limit, which amounted to $56,000.00.  Doc. 7-1, p. 11.

The Plaintiff originally claimed that the only damage sustained as a result of Hurricane Matthew and covered under the Policy was $3,319.21 in damages.  Doc. 14, p. 4, ¶13; Doc. 11-2. Given the deductible of $56,000.00, the Plaintiff originally offered to provide no funds for the

---

[1] The transcript and exhibits of the Deposition of Dia Suri, LLC's 30(b)(6) representative, Dhaval J. Desai, April 9, 2019, are filed as Doc. 36 in the instant matter.  However, the cites contained herein correspond to the transcript pages and not the page numbers provided at the top of Doc. 36. True and accurate excerpts of said transcript are attached hereto as Exhibit "1".
[2] A true and accurate copy of the Policy is attached hereto as Exhibit "2".

damages sustained by the Property as a result of Hurricane Matthew.  Doc. 14, p. 4, ¶13; Doc. 11-2.

In response to the Defendant's demand letter dated August 11, 2017 and over one (1) year after (i) Hurricane Matthew, and in recognition of (ii) the Defendant's notification of the Plaintiff of its claim, and in further response to (iii) the Defendant's original pre-suit demand for payment, the Plaintiff provided an initial payment in the amount of $132,202.06 on or about November 7, 2017 for the physical damage caused by Hurricane Matthew.  Doc. 14, p. 5, ¶21; Doc. 11-5.  The initial payment released by the Plaintiff represented compensation for the same damage that the Plaintiff originally claimed was only $3,319.21.  Doc. 11, p. 17, ¶22.

On November 11, 2017, the Plaintiff finally provided the Defendant with the Damage Estimate prepared by Clay Kincaid, upon which the Plaintiff based its payment of $132,202.06 to the Defendant.  Doc. 14, p. 6, ¶23; Doc. 11-6.  Mr. Kincaid inspected the Property on May 9, 2017, over seven (7) months following Hurricane Matthew.  Doc. 14, p. 6, ¶24; Doc. 11-6.  The check for $132,202.06 was not, however, issued until November 7, 2017.  Doc. 14, p. 7, ¶26; Doc. 11-5.  Additionally, said amount was unilaterally calculated by the Plaintiff.  Doc. 11-5.

Despite finally issuing the check for $132,202.06 over one (1) year after the actual loss, the Plaintiff did not account for all of the physical damage caused by Hurricane Matthew to the Property.  Doc. 11, p. 17, ¶27; Doc. 14, p. 7, ¶26; Doc. 11-5.  Given the actual damage sustained, the initial payment did not resolve the entirety of the Defendant's claim for physical damage to the Property.  Doc. 11, p. 17, ¶27.  Therefore, on November 20, 2017, and on December 12, 2017, pursuant to the Policy, specifically, section E(2) Appraisal, the Defendant made written demand for an appraisal of the loss for the physical property damage.  Doc. 14, p. 7, ¶¶28-29; Doc. 11-7; Doc. 11-8.

On May 2, 2018, the appraisal award for the physical damage sustained as a result of Hurricane Matthew was issued.  Doc. 14, p. 9, ¶34; Doc. 11-11.  The Appraisal Award provided that the actual cash value (the "ACV") Building Loss was $254,149.71.  Doc. 14, p. 9, ¶35; Doc. 11-11.  On May 23, 2018, the Plaintiff then issued a second payment in the amount of $75,947.65.  Doc. 14, p. 9, ¶36; Doc. 11-12.  The final payment of $108,921.30 for the physical damage to the Property was not issued by the Plaintiff until December 13, 2018.  A true and accurate copy of the Plaintiff's check dated December 13, 2018 is attached hereto as Exhibit "3".  Therefore, the actual damages covered under the Policy was not finalized until May 2, 2018, which was well over a year after the date of the loss – October 7, 2016.  Doc. 11-11.  Additionally, the Defendant did not receive all of the funds it was entitled to under the Appraisal Award until December 13, 2018, which was well over two (2) years after the date of the loss.  Exhibit 3.

The Defendant also made a claim for Loss of Business Income.  Doc. 14, p. 9, ¶38; Doc. 11-13.  On April 9, 2018, in connection with this claim, the Defendant executed and provided Sworn Statement of Loss to the Plaintiff, who acknowledged receipt of said statement.  Doc. 14, p. 9, ¶37; Doc. 11-13; Doc. 11-14.

On May 14, 2018, in response to the Sworn Statement of Loss, the Plaintiff released an initial payment in the amount of $13,023.00 for the business income loss caused by Hurricane Matthew.  Doc. 14, p. 10, ¶41; Doc. 11-15.  The Summary of Loss prepared by Bennett Thrasher, LLP on behalf of the Plaintiff calculated the business income loss based upon the alleged loss suffered from Thursday, October 6, 2016 through Sunday October 9, 2016, which represented a period of four (4) days.  Doc. 14, p. 10, ¶42; Doc. 11-15.  On July 30, 2018, the Plaintiff released a second payment in the amount of $115.00 for the business income loss caused by Hurricane Matthew.  Doc. 14, p. 12, ¶49; Doc. 11-17.

From the date of the hurricane damage, October 7, 2016, the Plaintiff refused to adjust claim in good faith and would not release funds to the Defendant so that it could fully repair the damage and restore the Property. In effort to mitigate damages, the Defendant made temporary repairs to avoid any further damage to the Property after the hurricane.  Dia Suri Depo., 50:23-51:2.  However, the Defendant was unable to make permanent repairs until after the Plaintiff adjusted the claim, agreed to the covered damages and provided funds to the Defendant for said repairs.  Dia Suri Depo., 70:25-71:4.  Again, the Appraisal Award was not issued until May 2, 2018, and the final funds were not issued until May 23, 2018.  Doc. 14, p. 9, ¶¶34-36; Doc. 11-11; Doc. 11-12.  The Loss of Income did not end until all the repairs were completed in June of 2018.  Therefore, the Defendant has suffered a business income loss from October 7, 2016 (the date of the hurricane damage) to June of 2018 (the date the construction was completed).

## III.    THE POLICY.

As stated above, the Defendant sought repair of and payment for damage that occurred during Hurricane Matthew under the Businessowners Policy GL, No. 10X25958-01 (again, the "Policy") issued by the Plaintiff.  Regarding the Loss of Business Income, the Policy provides the following: "We [American Family] will pay for the actual loss of Business Income you sustain due to the necessary suspension of your 'operations' during the 'period of restoration'."  Exhibit 2, p. 18.  The Policy further defines the phrase "period of restoration".  More specifically, the Policy states that the "period of restoration" means the period of time that begins "immediately after the time of direct physical loss or damage caused by or resulting from any Covered Cause of Loss at the described premises of the dependent property" and ends on "[t]he date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality".  Exhibit 2, pp. 35, 51.  Additionally, the Policy attempts to limits the total

"period of restoration" to the "12 consecutive months after the date of direct physical loss or damage." Exhibit 2, p. 18. Therefore, the "period of restoration" at a minimum could extend until October 5, 2017. Exhibit 2, p. 18.

The beginning date of the "period of restoration" is not at issue. On October 6, 2016, the Defendant's Best Western hotel suffered damage as a result of Hurricane Matthew. Dia Suri Depo., 31:3-13. Therefore, the "period of restoration" began on October 6, 2016. Exhibit 2, p. 51. As more fully explained below, it is the end of the "period of restoration" that is the subject of this dispute.

The Policy also defines business income and provides how to calculate the loss of business income:

(c) Business Income means the:

(i) Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred if no physical loss or damage had occurred, but not including any Net Income that would likely have been earned as a result of an increase in volume of business due to favorable business conditions caused by the impact of the Covered Cause of Loss on customers or other businesses; and

(ii) Continuing normal operating expenses incurred, including payroll.

Exhibit 2, p. 18-19.

Lastly, the Policy also provides coverage for Extended Business Income. More specifically, the Policy states the following regarding said Extended Business Income:

(a) If the necessary suspension of your "operations" produces a Business Income loss payable under this policy, we will pay for the actual loss of Business Income you incur during the period that:

(i) Begins on the date property except finished stock is actually repaired, rebuilt or replaced and "operations" are resumed; and

(ii) Ends on the earlier of:

6

    i. The date you could restore your "operations", with reasonable speed, to the level which would generate the Business Income amount that would have existed if no direct physical loss or damage had occurred; or

    ii. 30 consecutive days after the date determined in Paragraph (a)(i) above, unless a greater number of consecutive days is shown in the Declarations.

<u>Exhibit 2</u>, p. 19.

## IV.    THE EXPERT.

Plaintiff's Motion to Exclude Testimony and Report is directed towards the factual basis of the Expert Report of the Defendant's proffered expert, Mr. Fred Bonner. <u>Doc. 30</u>. The Plaintiff does not dispute (1) Mr. Bonner's qualification, or (2) the relevance of Mr. Bonner's Expert Report. <u>Doc. 30-1</u>, p. 5. Mr. Bonner was hired by the Defendant to calculate the period of time it should reasonably take to complete the repairs of the damages awarded under the Appraisal Award. As briefed in detail below, said time period is not necessarily the "period of restoration" as defined by the Policy.

## <u>ARGUMENT AND CITATION OF AUTHORITY</u>

## I.    LEGAL STANDARD FOR EXPERT TESTIMONY.

The purpose of expert testimony is to assist trier of facts to understand, evaluate, and decide complex evidential material. <u>United States v. R. J. Reynolds Tobacco Co.</u>, 416 F. Supp. 313, 315 (D.N.J. 1976). Such witnesses, due to their special skills, knowledge, education and training, may testify in the form of an opinion or otherwise. <u>Selvidge v. United States</u>, 160 F.R.D. 153, 155 (D. Kan. 1995).

Federal Rule of Evidence 702 governs the admissibility of said expert testimony. As a threshold matter, Rule 702 requires qualification by "knowledge, skill, experience, training, or education." <u>Fed. R. Evid. 702</u>. Rule 702 permits testimony from a qualified expert if: (1) the

expert's knowledge will assist the trier of fact to understand the evidence or determine a fact in issue; (2) the expert bases the testimony on "sufficient facts or data"; (3) the expert's testimony "is the product of reliable principles and methods"; and (4) "the expert has reliably applied the principles and methods to the facts of the case." Id. In this regard, Rule 702 incorporates the principles the Supreme Court set out in Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993) and Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999).

## II.     THE COURT'S ROLE IN EVALUATING THE PROFFERED EXPERT.

The Eleventh Circuit has cautioned that "[m]any factors will bear on the inquiry, and [there is no] definitive checklist or test" when addressing a motion such as the one here. Maiz v. Virani, 253 F.3d 641, 665 (11th Cir. 2001) (quoting Daubert, 509 U.S. at 593, 113 S.Ct. 2786). While Daubert and its progeny provide flexible guidelines for the admissibility of evidence under Rule 702, "expert testimony that does not meet all or most of the Daubert factors may sometimes be admissible" based on the particular circumstances of a specific case. United States v. Brown, 415 F.3d 1257, 1266–68 (11th Cir. 2005); see also United States v. Scott, 403 Fed. Appx. 392, 397 (11th Cir. 2010) (finding that the Daubert factors are only general guidelines and the trial judge has "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable"); Quiet Tech. D C–8, Inc. v. Hurel–Dubois UK Ltd., 326 F.3d 1333, 1341 (11th Cir. 2003) (finding that the court should consider the Daubert factors "to the extent possible" but that "these factors do not exhaust the universe of considerations that may bear on the reliability of a given expert opinion, and a federal court should consider any additional factors that may advance its Rule 702 analysis").

Some flexibility is applied in reliability determinations. United States v. Frazier, 387 F.3d 1244, 1262 (11th Cir.2004).  Rule 702 embodies a "liberal standard" of admissibility for expert

testimony. *See, e.g.*, <u>Grand River Enter. Six Nations, Ltd. v. King</u>, 783 F. Supp. 2d 516, 526 (S.D.N.Y. 2011) (*quoting* <u>Nimely v. City of New York</u>, 414 F.3d 381, 395 (2d Cir. 2005)).  Rule 702 is a flexible standard that "grants the district judge the discretionary authority, reviewable for its abuse, to determine reliability in light of the particular facts and circumstances of the particular case." <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137, 158 (1999); <u>United States v. Hankey</u>, 203 F.3d 1160, 1168-69 (9th Cir. 2000) (trial court must be given broad discretion to decide whether to admit expert testimony).  In examining the reliability of expert testimony, the inquiry courts conduct under Rule 702 "is a flexible one". <u>Cohalan v. Genie Indus.</u>, 2013 WL 829150, at \*2 (S.D.N.Y. Mar. 1, 2013) (*citing* <u>Daubert</u> 509 U.S. at 594).

Additionally, it is important to note that "the rejection of expert testimony is the exception rather than the rule." <u>Cedar Petrochems., Inc. v. Dongbu Hannong Chem. Co.</u>, 769 F. Supp. 2d 269, 282 (S.D.N.Y. 2011) (*quoting* Rule 702 advisory committee's note); <u>Park West Radiology v. CareCore Nat'l LLC</u>, 675 F. Supp. 2d 314, 327 (S.D.N.Y. 2009) (*quoting* Rule 702 advisory committee's note). Courts should apply Rule 702 consistent with the "'liberal thrust' of the Federal Rules and their 'general approach of relaxing the traditional barriers to opinion testimony.'" <u>Daubert</u>, 509 U.S. at 588 (*quoting* <u>Beech Aircraft Corp. v. Rainey</u>, 488 U.S. 153, 169 (1988)). If an expert satisfies the qualifications of Rule 702, he or she has "wide latitude to offer opinions." <u>Daubert</u>, 509 U.S. at 592.

At all times when scrutinizing the reliability and relevance of expert testimony, a court must remain mindful of the delicate balance between its role as a gatekeeper and the jury's role as the ultimate fact-finder. <u>Bryant v. BGHA, Inc.</u>, 9 F. Supp. 3d 1374, 1387 (M.D. Ga. 2014).  "A district court's gatekeeper role under Daubert 'is not intended to supplant the adversary system or the role of the jury.'" <u>Maiz v. Virani</u>, 253 F.3d 641, 666 (11th Cir. 2001) (*quoting* <u>Allison v.</u>

McGhan, 184 F.3d 1300, 1311 (11th Cir. 1999)).  "[I]t is not the role of the district court to make ultimate conclusions as to the persuasiveness" of the expert's testimony. Ahuja v. Cumberland Mall, LLC, 821 F. Supp. 2d 1317, 1322 (N.D. Ga. 2011) (quoting Quiet Tech. DC–8, Inc. v. Hurel–Dubois UK Ltd., 326 F.3d 1333, 1341 (11th Cir.2003)). Rather, "'[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible'" expert testimony. Id.  A court may not "evaluate the credibility of opposing experts" or the "persuasiveness of competing scientific studies;" instead, its duty is limited to "ensur[ing] that the fact-finder weighs only sound and reliable evidence." Quiet Tech. DC–8, Inc. v. Hurel–Dubois UK, Ltd., 326 F.3d 1333, 1341 (11th Cir. 2003); Frazier, 387 F.3d at 1272.

So long as the expert relies upon record evidence and identifies the facts on which he relies, "it is for opposing counsel to inquire into the expert's factual basis," and "[i]mportantly, the jury is instructed that it is completely free to accept or reject an expert's testimony, and to evaluate the weight given such testimony in light of the reasons the expert supplies for his opinion." United States v. 0.161 Acres of Land, 837 F.2d 1036, 1040 (11th Cir. 1988) (noting that an expert's opinion is admissible "provided that he states the assumptions on which his opinions are based," even if those assumptions omit certain evidence).  In other words, the facts relied upon by an expert "must find some support ... in the record" and "must be supported by more than subjective belief and unsupported speculation," but "mere weaknesses in the factual basis of an expert witness' opinion bear on the weight of the evidence rather than on its admissibility." McLean v. 988011 Ontario, Ltd., 224 F.3d 797, 800–01 (6th Cir. 2000) (internal punctuation omitted).

### III.    MR. BONNER'S QUALIFICATIONS.

Mr. Bonner's qualifications are not challenged in the Plaintiff's Motion to Exclude. However, in an effort to assist this Honorable Court, the Defendant will provide a brief statement of Mr. Bonner's qualifications.  As to the first prong of Rule 702 – qualifications – "experts may be qualified in various ways," including by scientific training, education, and experience. United States v. Frazier, 387 F.3d 1244, 1260–61 (11th Cir. 2004).  Rule 702 provides that a witness "may be qualified as an expert by virtue of his or her 'knowledge, skill, experience, training, or education.' " Quiet Tech. DC–8, Inc. v. Hurel–Dubois UK Ltd., 326 F.3d 1333, 1342 (11th Cir.2003) (quoting Fed.R.Evid. 702). Accordingly, in determining whether a proffered expert is "qualified" to offer an opinion, courts generally look to evidence of the witness's education and experience and ask whether the subject matter of the witness's proposed testimony is sufficiently within the expert's expertise. In re Mentor Corp. ObTape Transobturator Sling Prod. Liab. Litig., 711 F. Supp. 2d 1348, 1367 (M.D. Ga. 2010), see e.g., Maiz v. Virani, 253 F.3d 641, 665 (11th Cir.2001).

Mr. Bonner is qualified as an expert to testify regarding the time required to complete the repairs awarded in the Appraisal Award because of his education, training and experience. Regarding his education, Mr. Bonner studied for two (2) years at Armstrong University focusing on business economics.  Deposition of Fred Bonner, May 10, 2019 ("Bonner Depo."), 23:21-23; 31:24-32:2; Doc. 21-1.[3]

---

[3] The transcript and exhibits of the Deposition of Fred Bonner, May 10, 2019, are filed as Doc. 35 in the instant matter.  However, the cites contained herein correspond to the transcript pages and not the page numbers provided at the top of Doc. 35.  True and accurate excerpts of said transcript are attached hereto as Exhibit "4".

Regarding his training, Mr. Bonner received the following advanced training: (1) Certified Train the Trainer NRCA Instructor, (2) Certified Train the Trainer GRCA Instructor, (3) Photocell Electric Mechanic, (4) Master Journeyman Sheetmetal Mechanic, (5) Certified Master Lighten Protection Installer, (6) Certified Mold Remediation, (7) Certified Mold Testing and Sampling, (8) Certified Asbestos Remediation, (9) Certified Asbestos Testing and Sampling, (10) Certified and Licensed instructor of Drug Awareness Courses, (11) Master Licensed Installer for Johns Manville, (12) Master Licensed Installer for Soprema, (13) Master Licensed Installer for Siplast, (14) Master Licensed Installer for CertainTeed, (15) Master Licensed Installer for GAF, (16) Master Licensed Installer for Tremco, (17) Master Licensed Installer for Carlisle, and (18) Master Licensed Installer for Firestoneis.  Bonner Depo., 31:13-23; Doc. 21-1.

Regarding his experience, from 1993 through the present, Mr. Bonner was, and currently is, the Chief Executive Officer for Bonner Roofing Company, which is a roofing company for commercial, industrial, municipal and institutional entities operating for over fifty (50) years throughout the southeast.  Bonner Depo., 24:20-22, 25:13-14; Doc. 21-1.  Additionally, from 2009 to present, Mr. Bonner was, and is still currently, the Chief Executive Officer for RR Restoration, which provides restoration services and emergency repair services.  Bonner Depo., 24:16-19, 25:8-12; Doc. 21-1.  He was also the Vice President of the Georgia Roofing Association.  Bonner Depo., 31:6-12; Doc. 21-1.  During his time in the above-referenced positions, Mr. Bonner has supervised work on several projects, including, but not limited to: (1) Orlando International Airport, (2) NASA, (3) United Launch and Assembly, (4) Georgia Power, (5) 165th Air Wing Group of Savannah, Georgia, (6) Chevron Oil Headquarters, (7) Ventnor Shopping Mall, (8) City Hall in Ventnor, New Jersey, and (9) Columbia Medical Living Facility.  Bonner Depo., 30:15-19; Doc. 21-1.  While working for Bonner Roofing Company, Mr. Bonner has performed all functions

related to roofing, including the installation of roofs, sheet metal roofs, single-ply roofs, estimation, and running the company itself.  Bonner Depo., 26:5-12.  While working for RR Restoration, Mr. Bonner has performed all functions related to estimation and restoration work. Bonner Depo., 26:15-27:2

Therefore, given his knowledge, skill, experience, training, and education, Mr. Bonner is qualified as an expert in the instant matter for the calculation of the time period required to complete the repairs authorized by the Appraisal Award.

## IV.  MR. BONNER'S TESTIMONY IS RELIABLE AND BASED UPON EVIDENCE IN THE RECORD.

Again, the Plaintiff does not dispute (1) Mr. Bonner's qualification, or (2) the relevance of Mr. Bonner's Expert Report.  Doc. 30-1, p. 5.  The Plaintiff does, however, dispute the reliability of Mr. Bonner's Expert Report.  Doc. 30-1, p. 5.  The Plaintiff claims that because Mr. Bonner's Expert Report is not entirely based upon the Appraisal Award, it is not reliable and should be excluded from the record in the instant matter.  Doc. 30-1, pp. 5-10.

Contrary to the Plaintiff's Brief in Support, Mr. Bonner did review the Appraisal Award when preparing his Expert Report.

Q.  And then you reviewed the Appraisal Award?

A.  Yes.

Q.  Because you attached that as Exhibit 4 to your report; is that correct?

A.  Yes.

Bonner Depo., 41:24-42:3.  As noted in this exchange, Mr. Bonner even included the appraisal award as an exhibit to his own report.  Doc. 21-4.  In fact, said Expert Report provides that the exhibits that "summarize or support" Mr. Bonner's opinions are attached thereto, including the Appraisal Report. Doc. 21, p. 8.

Additionally, some of the specific items listed in Mr. Bonner's Expert Report were also contained within the Appraisal Award.

Q.  And you said, "The low sloped roof on the main structure will need to be replaced." Again, is that -- is that based on your observation?

A.  Yes.

Q.  And do you know if that was awarded in the Appraisal Award?

A.  It was.

Bonner Depo., 69:4-10.

Furthermore, the Appraisal Award contained very little detail, and, therefore, Mr. Bonner referred to the Strategic Claims Consultant report for detail.  Regarding the metal mansard roof, the Appraisal Award did not provide square footage of the roof that needed to be replaced – it merely stated "partial" for the replacement.

Q.  Does the Appraisal Award award the whole metal roof?

A.  It doesn't have a square footage there.  It says "partial".

*       *       *

A.  I don't know. It doesn't have a square footage here. It just says "partial".

Bonner Depo., 58:24-59:2, 15-19.  The Appraisal Award also does not provide the number of rooms and hallways affected by the storm damage – it merely gives a monetary value.

A.  Well, the Appraisal Award doesn't give the square footages of the interior.

*       *       *

A.  But there's no reference to -- in the interior portion of the appraisal, it doesn't have a room number, I don't think.

*       *       *

14

Q.  The Appraisal Award doesn't tell us how many rooms?

A.  Correct.

*     *     *

Q.  If you were limited, not knowing amount of rooms or hallways, to that award of funds, how long do you think it would take you to complete repairs?

A.  I don't think you can get any of that done -- and here would be a variable, you know. What of its hallways. Because that really, you know, is an area of a bunch of people potentially in also.

<u>Bonner Depo.</u>, 55:12-13, 76:18-20, 78:17-19, 86:19-25.

The Plaintiff's own Expert, Mr. Daniel Turpin, also acknowledged that the Appraisal Award was lacking important details and could not be relied upon entirely.  In fact, Mr. Turpin identified several areas in which the Appraisal Award was lacking:

Q. Okay. And the, "Exterior sign will need repair (extent unknown)." Why did you include extent unknown on there?

A.  *Well, that was one area that even in the appraisal award there was some gray* -- I believe the way it read was it has to be inspected and be tested. *So there's not really a known exact figure of what it's going to cost.* So I left it open because I couldn't distinguish a cost.

*     *     *

Q.  Okay. And specifically where did you get the painting from on this page?

A.  *Well, sir, it's actually not here.*

*     *     *

15

Q.  Okay. And what work specifically did you have in your report needing to be done for the hallways? Because you put in your report two hallways needed repair. What repair is that?

A.  I looked at the elevations. If you look at this front east elevation, the way the building is there is a hallway there. So looking at based just off of this *I made the assumption the hallways would have been here*. The interior hallways would have been painting. *So that's the way I took this to read because this is what I based it off of*.

                    *          *          *

Q.  Okay. And again under Inside it just has the words rooms and halls.

A.  Uh-huh.

Q.  Where then did you get that nine rooms needed to be repaired and two hallways needed to be repaired?

A.  I'm going to say without -- I'd have to go back 18 and look through this but if I used the word nine 19 rooms –

Q.  Nine units. Sorry.

A.  Yeah, nine units. If I used nine units I would have taken it from the estimate that I saw.

Q.  The American Family estimate –

A.  Correct.

Q.  Prepared by Clay Kincaid?

A.  Yes, sir.

Q.  Okay.

A.  Because that is what it stated. So, like I said, I used this as my basis. *But I didn't see anywhere where they put any amount of rooms like more than that was already there so I used it.*

\*     \*     \*

Q.  Then if you look at Area: Level 3 and Area: Level 2.

A.  Uh-huh.

Q. I think if you add those up you get nine rooms 5 and two hallways; is that correct?

A. Let's see. Yes, sir.

Q.  Okay. Is this where you got your information that's used in your report, specifically the nine units and two hallways of structure?

A. I would believe so, yes, sir, because that's the only way I would have known.

Q. And again, that information wasn't included in the appraisal award; is that correct?

A. *No. They -- the way they did theirs is they did almost like a bundled number* if you kind of look at these. So I'm sure what they did was looked at whatever damage they saw there and came up with a number.

\*     \*     \*

Q. Did you include anything in there for the detached sign?

A. Detached sign?  Based on what I remember writing it would have been under numeral VIII as part of the signage, the detached and attached sign. One we know of. Looks like there is a 10,947 but I do not know the other one. *I do not know if*

17

*zero means zero dollars awarded or does it mean unknown. So I didn't want to*

*assume that because I didn't know what the zero meant.*

Deposition of Daniel Ray Turpin, April 26, 2019 ("Turpin Depo."), 41:2-11, 43:20-22, 56:3-13, 57:12-58:6, 59:1-17 (emphasis added).[4]

Finally, Mr. Bonner testified that the repairs covered under the Appraisal Award would take one hundred twenty (120) days to complete, which is the exact same amount of time provided in his expert report. More specifically, Mr. Bonner stated the following:

Q. The flat roof that is given in the Appraisal Award, is that for a complete replacement?

A. Yes.

Q. And you had previously stated that that alone would take 60 days; is that correct?

A. Correct.

Q. And then would you do that separately or concurrently with the metal slanted roof?

A. Separately.

*        *        *

Q. Okay. So based off the Appraisal Award of the $62,997.77 for the metal slanted roof, you think that would take approximately 25 to 30 days?

A. Correct.

---

[4] The transcript and exhibits of the Deposition of Daniel Ray Turpin, April 26, 2019, are filed as Doc. 38 and Doc. 38-1 in the instant matter. However, the cites contained herein correspond to the transcript pages and not the page numbers provided at the top of Doc. 38 and Doc. 38-1. True and accurate excerpts of said transcript are attached hereto as Exhibit "5".

*     *     *

A.  So we're between 120 and 115.

*     *     *

Q.  Okay. So you think it would take between 115 to 120 days to complete the amount of work given in the Appraisal Award?

A.  Correct.

<u>Bonner Depo.</u>, 88:14-23, 89:17-20, 90:8-9, 90:12-15.

Therefore, the Expert Report and testimony of Fred Bonner are based upon evidence in the record – namely, the Appraisal Award and the Strategic Claims Estimate.  Given Rule 702's "liberal standard" of admissibility for expert testimony and the fact that Mr. Bonner's report and testimony are based upon evidence in the record, the Plaintiff's Motion to Exclude Testimony and Report of Fred Bonner must be DENIED. *See, e.g.*, <u>Grand River</u>, 783 F. Supp. 2d at 526; <u>In re Delta/Airtran Baggage Fee Antitrust Litig.</u>, 245 F. Supp. 3d 1343, 1361 (N.D. Ga. 2017), *aff'd sub nom.* <u>Siegel v. Delta Air Lines, Inc.</u>, 714 F. App'x 986 (11th Cir. 2018), *cert. denied*, 139 S. Ct. 827, 202 L. Ed. 2d 579 (2019).  Again, any alleged weaknesses in the factual basis of an expert witness' opinion bear on the weight of the evidence rather than on its admissibility. <u>McLean</u>, 224 F.3d at 800–01.  Therefore, the proper avenue the address such alleged weaknesses in through cross-examination in front of the jury – not through a motion to exclude.  <u>United States v. 0.161 Acres of Land</u>, 837 F.2d at 1040.

## V.     THE PLAINTIFF MISINTERPRETS POLICY LANGUAGE.

Although not entirely limited to the issue of the factual basis of Mr. Bonner's Expert Report, the Plaintiff also makes arguments related to the interpretation of the Policy itself and the

19

"period of restoration".[5]  However, the Plaintiff's interpretation of the Policy language is incorrect.

According to the Plaintiff, the Defendant should have begun repairs of the Property immediately

following the damage that occurred on or about October 6, 2017.  However, this requirement is

not included in the Policy.  The Policy merely provides that the period of restoration ends when

the Property "should be repaired, rebuilt or replaced".  It does not require that the repairs begin

immediately.  Thus, the Plaintiff has incorrectly interpreted the end of the "period of restoration".

In fact, as discussed in further detail below, it was impossible for the repairs to begin immediately

in the instant matter.

A federal court sitting in diversity applies the choice of law rules of the forum state to

determine which law applies.  Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 496, 61 S.

Ct. 1020, 85 L. Ed. 1477 (1941); see also Travelers Property Cas. Co. of America v. Moore, 763

F.3d 1265 (11th Cir. 2014) (federal court sitting in diversity action applies state law using choice

of law rules of forum state and that Georgia follows the lex loci contractus rule under which

contracts are to be governed by law of the place where they were made).  Therefore, as stated in

the Amended Complaint, Georgia law must be applied in the interpretation of the American Family

insurance contract issued to a Georgia insured at the insured's address in Georgia.  Federal Ins. Co.

v. National Distributing Co., Inc., 203 Ga. App. 763 (1992); Brown v. Nichols, 8 F.3d 770 (11th

Cir. 1993); Doc. 7, p. 3, ¶ 13.

In interpreting this language, the court is mindful that the words of an insurance contract

are to be understood in their plain, ordinary, popular sense.  Atlas Assurance Co., Ltd. v. Lies, 70

---

[5] Said issue should really be more appropriately addressed in the Motion for Summary Judgment.
However, the Defendant feels obligated to address the Plaintiff's arguments herein.  For a full and
complete briefing, see Defendant's Brief in Opposition to Plaintiff's Motion for Summary
Judgment, which will be timely filed as required by Doc. 39.

Ga. App. 162, 27 S.E.2d 791 (1943).  Moreover, the court recognizes that in Georgia an insurance contract is construed in favor of the insured and against the insurance company when its meaning is ambiguous.  United National Ins. Co. v. Cody, 81 Ga. App. 527, 59 S.E.2d 310 (1950); Georgia, Sou. & Fla. Ry. Co. v. United States Casualty Co., supra, aff'd, 272 F.2d 712 (5th Cir., 1960).

Under Georgia law, it is well settled that because insurance policies are contracts of adhesion, drawn by the legal draftsman of the insurer, they are to be construed as reasonably understood by an insured.  Lee v. Mercury Ins. Co. of Georgia, 343 Ga. App. 729, 732–33, 808 S.E.2d 116, 122–23 (2017), cert. denied (Aug. 2, 2018) (citing First Financial Ins. Co. v. American Sandblasting Co., 223 Ga. App. 232 (1), 477 S.E.2d 390 (1996)).  "The policy should be read as a layman would read it and not as it might be analyzed by an insurance expert or an attorney." Cincinnati Ins. Co. v. Davis, 153 Ga. App. 291, 295, 265 S.E.2d 102 (1980).  "The insurer, in preparing the language of its policy, has the burden of using language that is clear and precise." Ga. Farm Bureau Mut. Ins. Co. v. Meyers, 249 Ga. App. 322, 324, 548 S.E.2d 67 (2001).  "The test is not what the insurer intended its words to mean, but what a reasonable person in the position of the insured would understand them to mean." United States Fire Ins. Co. v. Capital Ford Truck Sales, 257 Ga. 77, 78 (1), 355 S.E.2d 428 (1987).

"[I]f a provision of an insurance contract is susceptible of two or more constructions, even when the multiple constructions are all logical and reasonable, it is ambiguous, and the statutory rules of contract construction will be applied."  American Strategic Ins. Corp. v. Helm, 327 Ga. App. 482, 485, 759 S.E.2d 563 (2014).  "Ambiguity in an insurance policy may [also] be defined as duplicity, indistinctness, an uncertainty of meaning or expression." Alley v. Great American Ins. Co., 160 Ga. App. 597, 599, 287 S.E.2d 613 (1981).  When a provision of an insurance contract is ambiguous, a well-known rule of construction is that it will be "construed against the party

preparing it and in favor of coverage." Fireman's Fund Ins. Co. v. Univ. of Ga. Athletic Assn., 288 Ga. App. 355, 357 n. 1, 654 S.E.2d 207 (2007). "A crucial principle is that insurance policies are construed so as to avoid forfeitures and to provide coverage." James v. Pennsylvania Gen. Ins. Co., 167 Ga. App. 427, 430, 306 S.E.2d 422, 425 (1983) (quoting Imperial Enterprises, Inc. v. Fireman's Fund Ins. Co., 535 F.2d 287, 290 (5th Cir.1976)).

As stated, the "period of restoration" ends on "[t]he date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality". Exhibit 2, p. 35. Therefore, the key is when the Property "should be repaired, rebuilt or replaced". From the date of the hurricane damage, October 7, 2016, the Plaintiff refused to adjust claim in good faith and would not release funds to the Defendant so that it could fully repair the damage and restore the Property. The Defendant made temporary repairs to avoid any further damage to the Property after the hurricane. Dia Suri Depo., 50:23-51:2. At that point, the Defendant did not even know what the covered damages were going to be. Therefore, the Defendant was unable to make permanent repairs until after the Plaintiff adjusted the claim, agreed to the covered damages and provided funds to the Defendant for said repairs. Dia Suri Depo., 70:25-71:4.

It is also important to note that the Plaintiff originally claimed that the only damage sustained as a result of Hurricane Matthew and covered under the Policy was $3,319.21 in damages to the outdoor sign, with no other damage attributed to the Property itself. Doc. 14, p. 4, ¶13; Doc. 11-2. Given the deductible, the Plaintiff originally offered to provide no insurance funds for the damaged sustained by the Property as a result of Hurricane Matthew. Doc. 14, p. 4, ¶13; Doc. 11-2. The Defendant did not actually receive any funds from the Defendant until November 7, 2017, when it provided its initial payment in the amount of $132,202.06 for the physical, property damage caused by Hurricane Matthew. Doc. 14, p. 5, ¶21; Doc. 11-5. The Defendant could not,

and cannot be expected to, complete $363,071.01 in repairs without being provided any funds from the insurance company, the Plaintiff.  Doc. 11-5.  Furthermore, the funds for the actual cash value of the repairs were not issued until May 23, 2018.  Doc. 14, p. 9, ¶36; Doc. 11-12.  The final payment of $108,921.30 for the depreciation of the physical damage to the Property was not issued by the Plaintiff until December 13, 2018.  Exhibit 3.

Additionally, the actual physical damage to the Property was not agreed upon until the Appraisal Award was issued on May 2, 2018.  Doc. 14, p. 9, ¶34; Doc. 11-11. The Defendant could not, and cannot be expected to, complete the repairs until the parties have actually agreed to what is covered under the Policy.

Therefore, the Property "should be repaired, rebuilt or replaced" once the covered physical damage has been established and funds have been provided to complete said repairs.  That date was at the earliest May 23, 2018. Doc. 14, p. 9, ¶¶34-36; Doc. 11-11; Doc. 11-12.  *See* Hampton Foods, Inc. v. Aetna Cas. & Sur. Co., 843 F.2d 1140, 1143 (8th Cir.1988) (holding that insurer "should be liable for business interruption coverage for the duration of the reasonable period of time needed for [plaintiff] to reenter business plus any delay attributable to [insurer]'s failure to perform its duties under the policy"); Omaha Paper Stock Co. v. Harbor Ins. Co., 445 F. Supp. 179, 181 (D. Neb. 1978), *aff'd sub nom.* Omaha Paper Stock Co. v. Harbor Ins. Co., 596 F.2d 283 (8th Cir. 1979) (holding that, where much of the delay in reopening a plant damaged by fire "is attributable to the decisions made by [the insurer] and its adjusters," the insurer "is liable for business interruption coverage through ... the date when, but for the delays attributable to the insured, the plant could have been back in operation"); and A & S Corp. v. Centennial Ins. Co., 242 F. Supp. 584, 587–88 (N.D. Ill. 1965) (holding that period of business interruption extended

until date reconstruction was completed, where reconstruction did not commence until insurer's agent had checked and approved building plans).

In reality, the actual Loss of Income did not end until all the repairs were completed in June of 2018 as the Defendant has suffered a business income loss from October 7, 2016 (the date of the hurricane damage) to June of 2018 (the date the construction was completed). However, the Policy attempts to limit the total "period of restoration" to the "12 consecutive months after the date of direct physical loss or damage." Exhibit 2, p. 18. Therefore, given the above-referenced information and the fact that insurance policies are to be construed "against the party preparing it" and "so as to avoid forfeitures and to provide coverage", in the instant matter, the "period of restoration" extends at least until October 5, 2017. Exhibit 2, p. 18; Fireman's Fund Ins. Co., 288 Ga. App. at 357 n. 1; James, 167 Ga. App. at 430. Moreover, in Georgia an insurance contract is construed in favor of the insured and against the insurance company when its meaning is ambiguous. United National Ins. Co., 81 Ga. App. 527.

## VI.   THE PLAINTIFF ALSO MISINTERPRETS CASE LAW.

In its Brief in Support to Exclude the Report and Testimony of Mr. Bonner, the Plaintiff cites to Moore v. Travelers, 321 F. App'x 911, 913 (11th Cir. 2009), alleging that "an appraisal award resolves the value of damages in a loss." However, that is not what the Eleventh Circuit held in Moore. More specifically, the Eleventh Circuit ruled that "[t]he policy determines that coverage is decided by a court of law. The policy determines that the value of damages is decided by appraisal." Moore v. Travelers, 321 F. App'x 911, 913 (11th Cir. 2009). Therefore, it is the policy language itself that is controlling. However, the Plaintiff has not shown that the Policy at issue in the instant matter provides that the appraisal process fully and completely "resolves the

value of damages in a loss". Nor has the Plaintiff shown that the policy language quoted in <u>Moore</u> was the same as the terms and conditions of the instant Policy.

Additionally, the Eleventh Circuit granted that Motion to Dismiss for failure to state a claim upon which relief can be granted because the insured had not submitted to the appraisal process, which was condition precedent to bringing suit against the insured.   <u>Id.</u>  Said requirement is not contained within the Policy at issue.  Therefore, <u>Moore</u> is inapplicable to the instant matter.

## VII.   CONCLUSION.

For the reasons stated above, the Defendant respectfully requests that this Honorable Court DENY the Plaintiff's Motion to Exclude Testimony and Report of Fred Bonner.

RESPECTFULLY SUBMITTED THIS <u>12TH</u> DAY OF <u>JULY</u>, <u>2019</u>.

THE CONNER LAW GROUP, P.C.

/s/ David Michael Conner
David Michael Conner
State Bar No. 181845
dmconner@theconnerlawgroup.com
Robert M. Kutchey, III
State Bar No. 912553
rkutchey@theconnerlawgroup.com
P.O. Box 10720
Savannah, Georgia 31412
(877) 283-2745 (voice)
(877) 284-4682 (facsimile)
www.theconnerlawgroup.com
*Attorneys for Defendant DIA SURI, LLC*

## CERTIFICATE OF SERVICE

I, the undersigned attorney and counselor at law, do hereby certify that I have caused and instructed on this day to be served a true and correct copy of the DEFENDANT'S BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION TO EXCLUDE TESTIMONY AND REPORT OF FRED BONNER on the opposing party of record by directing that a copy of same be deposited in the United States Mail, with proper postage affixed and addressed to the following:

Stephanie F. Glickauf
GOODMAN MCGUFFEY, LLP
3340 Peachtree Road NE, Suite 2100
Atlanta, Georgia 30326-1084
*Attorneys for Plaintiff, American Family Insurance Company*

RESPECTFULLY SUBMITTED THIS 12TH DAY OF JULY, 2019.

THE CONNER LAW GROUP, P.C.

/s/ David Michael Conner
David Michael Conner
State Bar No. 181845
dmconner@theconnerlawgroup.com
Robert M. Kutchey, III
State Bar No. 912553
rkutchey@theconnerlawgroup.com
P.O. Box 10720
Savannah, Georgia 31412
(877) 283-2745 (voice)
(877) 284-4682 (facsimile)
www.theconnerlawgroup.com
*Attorneys for Defendant DIA SURI, LLC*