IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

AMERICAN FAMILY INSURANCE      )
COMPANY,                       )
                               )
        Plaintiff,             )
                               )
v.                             )     CASE NO. CV418-181
                               )
DIA SURI, LLC,                 )
                               )
        Defendant.             )
                               )

## O R D E R

Before the Court are Plaintiff's Motion to Exclude Testimony
and Report of Fred Bonner (Doc. 30), Plaintiff's Motion to Exclude
Testimony and Report of Dwain Begitschke (Doc. 31), and Plaintiff's
Motion to Strike Defendant's Brief in Opposition to Plaintiff's
Motion to Exclude (Doc. 42). For the following reasons, Plaintiff's
Motion to Strike Defendant's Brief in Opposition to Plaintiff's
Motion to Exclude (Doc. 42) is **DENIED**, Plaintiff's Motion to
Exclude Testimony and Report of Fred Bonner (Doc. 30) is **GRANTED
IN PART** and **DENIED IN PART**, and Plaintiff's Motion to Exclude
Testimony and Report of Dwain Begitschke (Doc. 31) is **DENIED**.

### BACKGROUND

This case is a declaratory judgment action involving a dispute
over insurance coverage for loss of business income. (Doc. 1.)
Defendant has filed a counterclaim to the declaratory judgment
action alleging breach of contract for Plaintiff's alleged failure

to compensate Defendant for its loss of business income claim. (Doc. 11.)

Defendant DIA SURI, LLC operates a Best Western hotel in Pooler, Georgia (the "Best Western"). (Doc. 32, Attach. 7 at ¶ 1; Doc. 44, Attach. 8 at ¶ 1.) The Best Western was insured by Plaintiff American Family Insurance Company ("American Family") under policy number 10X25958-01 (the "Policy") with effective dates October 12, 2015 through October 12, 2016. (Doc. 32, Attach. 7 at ¶ 2; Doc. 44, Attach. 8 at ¶ 2.) On October 6, 2016, the Best Western suffered damage due to a hurricane. (Doc. 32, Attach. 7 at ¶ 3; Doc. 44, Attach. 8 at ¶ 3.) On November 2, 2016, Plaintiff received a claim about the hurricane damage. (Doc. 44, Attach. 1 at 10.) On or around February 7, 2017, Plaintiff sent an estimate of covered damages to Defendant and contended that only $3,319.21 of damage was sustained. (Doc. 11, Attach. 2 at 3.) In response, Defendant hired Strategic Claim Consultants to determine the extent of damage incurred as a result of the hurricane and to estimate the cost of repair. (Doc. 11, Attach. 3.) Strategic Claim Consultants estimated the total cost of repair to be $928,638.11. (Id. at 14.) By demand letter dated August 11, 2017, Defendant, through counsel, demanded Plaintiff pay $872,638.11 which represents the $928,638.11 assessed by Strategic Claim Consultants less the deductible of $56,000.00. (Doc. 11, Attach. 4 at 3.) On November 7, 2017, Plaintiff paid Defendant $132,202.06. (Doc. 11,

Attach. 5 at 2.) Plaintiff also sent a copy of its own estimate that it used to determine the payment amount. (Doc. 11, Attach. 6 at 2.) Plaintiff used Clay Kincaid, with Syndicate Claims Services, Inc., and Kincaid estimate the replacement cost value for the dwelling to be $210,608.66 and the net claim to be $133,149.06. (Id. at 21.) He also found the net claim for "other structures" to be $153.42 and the net claim for "contents" to be $4,101.12. (Id. at 22-23.) By demand letters dated November 20, 2017, and December 12, 2017, Defendant, through counsel, demanded an appraisal of their loss pursuant to the Policy after receiving the payment of $132,202.06 due to the apparent disagreement about the total amount of the loss. (Doc. 11, Attach. 7; Doc. 11, Attach. 8.) On December 7, 2017, Plaintiff agreed to the appraisal. (Doc. 11, Attach. 9.) Each party identified their respective appraiser and the two appraisers appointed Albert Paxton as the umpire between them, as set out in the Policy. (Doc. 11, Attach. 11 at 2.) Paxton issued his appraisal award on May 2, 2018 and found the total loss to be $363,071.01, less depreciation for an actual cash value total of $254,149.71. (Id. at 6.) Plaintiff issued a second payment on May 23, 2018 in the amount of $75,947.65. (Doc. 11, Attach. 12.) The final payment of $108,921.30 was issued by Plaintiff on December 13, 2018. (Doc. 40, Attach. 3.)

Defendant also pursued a claim for loss of business income in the amount of $3,145,324.78. (Doc. 11, Attach. 13 at 4.) After

reviewing the claim, Plaintiff paid Defendant $13,023.00 which "represent[ed] the undisputed amount for the Business Income claim." (Doc. 11, Attach. 15 at 2.) Plaintiff issued a check in the amount of $13,023.00 on May 14, 2018. (Id. at 3.) Pursuant to Section I(A)(5)(f) of the Policy:

> We will pay for the actual loss of Business Income you sustain due to the necessary suspension of your "operations" during the "period of restoration". The suspension must be caused by direct physical loss of or damage to property at the described premises. The loss or damage must be caused by or result from a Covered Cause of Loss.

(Doc. 1, Attach. 2 at 17.) Further, the Policy limits the payment of Business Income to that loss that is sustained "during the 'period of restoration' and that occurs within 12 consecutive months after the date of direct physical loss or damage." (Id.) "Business Income" is defined by the Policy as

> (i) Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred if no physical loss or damage had occurred, but not including any Net Income that would likely have been earned as a result of an increase in the volume of business due to favorable business conditions caused by the impact of the Covered Cause of Loss on customers or on other businesses; and (ii) Continuing normal operating expenses incurred, including payroll.

(Id. at 17-18.) "Period of restoration" is defined as the period of time that:

> (1) Begins:
> (a) 72 hours after the time of direct physical loss or damage for Business Income Coverage; or
> (b) Immediately after the time of direct physical loss or damage for Extra Expense Coverage; caused

by or resulting from any Covered Cause of Loss at
the described premises; and
(2) Ends on the earlier of:
(a) The date when the property at the described
premises should be repaired, rebuilt or replaced
with reasonable speed and similar quality; or
(b) The date when business is resumed at a new
permanent location.

(Id. at 34.) The "direct physical loss" to the Best Western
occurred on October 6, 2016. (Doc. 44, Attach. 8 at ¶ 12.)

Defendant has retained a construction expert, Fred Bonner, to
opine on what repairs the Best Western required due to the
hurricane damage and the time estimated to complete the above
referenced repairs. (Doc. 21 at 3-8.) Mr. Bonner opined that, based
on the repairs he identified that needed to be complete, the
estimate of construction time is 120 days. (Id. at 6.) Defendant
also identified an expert on its loss of business revenue, Dwain
Begitschke. (Doc. 22.) Mr. Begitschke opines that Defendant
"suffered a loss of revenue in the sum and amount of Three Hundred
Twenty-Six Thousand, Six Hundred Eighty-Eight Dollars
($326,688.00) from July 1, 2017 through December 31, 2017 because
of physical damage caused by Hurricane Matthew." (Id. at 2.)
Plaintiff offers a competing loss of business revenue expert, J.
Kyle Aldridge, who opines that for the dates October 6-9, 2016,
Defendant suffered $13,138.00 in lost net income. (Doc. 23 at 8.)

**ANALYSIS**

I.   PLAINTIFF'S MOTION TO STRIKE

Generally, motions to strike are brought pursuant to Federal Rule of Civil Procedure 12(f), which provides that "[u]pon motion made by a party before responding to a pleading . . . the court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." The federal rules define a pleading as one of the following: "(1) a complaint; (2) an answer to a complaint; (3) an answer to a counterclaim designated as a counterclaim; (4) an answer to a crossclaim; (5) a third-party complaint; (6) an answer to a third-party complaint; and (7) if the court orders one, a reply to an answer." Fed. R. Civ. P. 7(a). "Pleadings are defined in Federal Rule of Civil Procedure 7(a) and do not include motions or supporting briefs." Donaldson v. Normand, No. 5:18-CV-7, 2019 WL 956809, at *4 (S.D. Ga. Feb. 27, 2019), report and recommendation adopted as modified, No. 5:18-CV-7, 2019 WL 1349684 (S.D. Ga. Mar. 26, 2019). See also Brantley v. Ferrell Elec., Inc., 112 F. Supp. 3d 1348, 1354 (S.D. Ga. 2015).

However, this Court will treat Plaintiff's motion to strike as an objection. The Court overrules the objection and denies Plaintiff's motion. Plaintiff seeks to strike Defendant's response brief on the basis that the page limit exceeds the limit set by Southern District of Georgia Local Rule 7.1(a). (Doc. 42 at 6.)

6

Defendant's response brief is thirty-one (31) pages in length and Local Rule 7.1(a) specifies that "no brief shall exceed twenty-six (26) pages in length" absent prior permission from the court. Defendant has responded in opposition to Plaintiff's motion to strike and argued that its response brief should not be stricken. (Doc. 43.) Defendant also attached the same response brief converted to 12-point Times New Roman font which, once the font was changed, equals twenty-six (26) pages in length. (Doc. 43, Attach. 1.) The Court finds Plaintiff's motion to strike is due to be denied. First, Defendant has shown that the brief, in another format, fits within this Court's length requirements. Second, Plaintiff has not shown how it was prejudiced. Accordingly, Plaintiff's motion (Doc. 42) is **DENIED.**

II.  PLAINTIFF'S MOTIONS TO EXCLUDE TESTIMONY AND REPORTS OF
     EXPERTS

A.  Standard of Review

The admission of expert testimony is controlled by Federal Rule of Evidence 702:

> A witness who is qualified as an expert by knowledge,
> skill, experience, training, or education may testify in
> the form of an opinion or otherwise if:
> (a)  the expert's scientific, technical, or other
> specialized knowledge will help the trier of fact to
> understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles
> and methods; and
> (d) the expert has reliably applied the principles and
> methods to the facts of the case.

7

The trial judge is assigned "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." <u>Daubert v. Merrell Dow Pharm., Inc.</u>, 509 U.S. 579, 597, 113 S. Ct. 2786, 2799, 125 L. Ed. 2d 469 (1993). "As the Supreme Court made abundantly clear in <u>Daubert</u>, Rule 702 compels district courts to perform the critical gatekeeping function concerning the admissibility of expert scientific evidence." <u>United States v. Frazier</u>, 387 F.3d 1244, 1260 (11th Cir. 2004) (internal quotation omitted). This gatekeeping function equally applies to the admissibility of expert technical evidence. <u>Id.</u>; <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137, 147-49, 119 S. Ct. 1167, 1174-75, 143 L. Ed. 2d 238 (1999). The Eleventh Circuit Court of Appeals has explained that district courts fulfill that function by engaging in a three-part inquiry, considering whether

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as to be determined by the sort of inquiry mandated in <u>Daubert</u>; and (3) the testimony assists the trier of fact, through the application of scientific . . . expertise, to understand the evidence or to determine a fact in issue.

<u>Frazier</u>, 387 F.3d at 1260.

When a court considers the reliability of a particular expert's opinion, it considers, to the extent possible, (1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the

known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community. See Quiet Tech. DC-8, Inc. v. Hurel-Dubois, UK, Ltd., 326 F.3d 1333, 1341 (11th Cir. 2003) (citing McCorvey v. Baxter Healthcare Corp., 298 F.3d 1253, 1256 (11th Cir. 2002)). These factors "do not constitute a definitive checklist or test." Kumho Tire, 526 U.S. at 150, 119 S. Ct. at 1175 (internal quotation marks and citation omitted). Rather, the applicability of these factors "depends upon the particular circumstances of the particular case at issue." Id. The same criteria that are used to assess the reliability of a scientific opinion may be used to evaluate the reliability of non-scientific, experience-based testimony. Frazier, 387 F.3d at 1262.

B. Plaintiff's Motion to Exclude Testimony and Report of Fred Bonner

Plaintiff moves to exclude Fred Bonner's testimony and expert report as irrelevant and unreliable. (Doc. 30, Attach. 1 at 4.) Plaintiff argues that Mr. Bonner's opinion that the necessary repairs would take 120 days should be excluded because his opinion is not based upon the repairs specified in the appraisal award and is instead based on report prepared by Strategic Claim Consultants. (Id. at 8.) Thus, because the parties are bound to the damages specified in the appraisal award, Plaintiff contends that an opinion based on a separate calculation of damages would not assist

a trier of fact in determining the "period of restoration." (Id. at 9.) In response, Defendant argues that Mr. Bonner's opinion is reliable because (1) he reviewed the Appraisal Award when preparing his expert report, (2) the Appraisal Award lacked significant details and could not be relied upon entirely, and (3) Bonner specified in his deposition that, based solely on the amount of work given in the Appraisal Award, it would take 115 to 120 days to complete. (Doc. 40 at 15-31.)

Plaintiff's motion is due to be granted. The Court finds that the Appraisal Award constitutes a binding award on the amount of physical loss and that Mr. Bonner's report and opinions, to the extent they are based on the Strategic Claims Estimate and not the Appraisal Award, are irrelevant and should be excluded.

First, according to the plain terms of the Policy, the Appraisal Award in this case is binding on the parties. The operative provision in the Policy provides:

> If we and you disagree on the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:
> a. Pay its chosen appraiser; and
> b. Bear the other expenses of the appraisal and umpire equally.
> If there is an appraisal, we will still retain our right to deny the claim.

10

(Doc. 1, Attach. 2 at 28.) Plaintiff's appraiser was Jim Stoops. (Doc. 11, Attach. 9 at 3.) Defendant selected Brian Rindt as the insured's appraiser. (Doc. 11, Attach. 10 at 2.) Albert Paxton was the umpire between them, as set out in the Policy. (Doc. 11, Attach. 11 at 2.) Jim Stoops, Brian Rindt, and Albert Paxton all signed the Appraisal Award. (Id.) Under the Policy, a decision agreed to by two of the three appraisers (the insurer's appraiser, the insured's appraiser, and the mutually selected umpire) is binding. Here, all three agreed to the award and, therefore, the appraisal award is binding.

Second, the Court finds that Mr. Bonner's opinions, as based on the Strategic Claims Estimate, should be excluded. Mr. Bonner opined that "[t]he estimate of the construction time to complete the above-reference repairs is one hundred (120) days," and that the basis for this opinion is that "[t]he 120 days will be for the roof work only and the interior time will depend on the availability of rooms and how many rooms we can access at one time to perform work." (Doc. 21 at 6.) Plaintiff moves to exclude this opinion on the grounds that it is improperly based on the Strategic Claims Estimate, not the Appraisal Award, and is therefore irrelevant. The Court agrees. It is clear from Mr. Bonner's deposition that his expert report was based upon the Strategic Claims Estimate. Mr. Bonner testified in his deposition that he

reviewed both the Strategic Claims Estimate and the Appraisal
Award, but based his opinion on the work contemplated in the
Strategic Claims Estimate and the work that be believed should be
completed. Mr. Bonner testified as follows:

> Q. Okay. So you estimated 120 days to do the roof work
> that you reference in your expert report?
> A. Correct.
> Q. Not the roof work that is referenced in the Appraisal
> Award?
> A. No.

(Doc. 35 at 71-72.) He also testified as follows:

> Q. Okay. And your opinion with regards to the time frame
> to complete repairs is based upon your view of the
> property; correct?
> A. Correct.
> Q. And the Strategic Claim estimate; correct?
> A. Yes.
> Q. And nothing else?
> A. And my background in doing this kind of work.
> Q. Yeah. I apologize. And your experience?
> A. Yes.
> Q. Okay. It's not based on any estimate prepared by
> anybody on behalf of American Family?
> A. No.
> Q. It's not based on the Appraisal Award?
> A. No.

(Id. at 75.)

Defendant urges this Court to find Mr. Bonner's expert report
reliable because he testified in his deposition that "the repairs
covered under the Appraisal Award would take one hundred twenty
(120) days to complete, which is the exact same amount of time
provided in his expert report." (Doc. 40 at 20-21.) Defendant,
however, mischaracterizes Mr. Bonner's testimony. Mr. Bonner, when

12

asked to give an estimate of time based upon the Appraisal Award, estimated 60 days for the flat roof and 25 to 30 days for the metal roof for a total of 85 to 90 days for roof repairs. (Doc. 35 at 91-92.) He estimated 115 to 120 days for all work contemplated in the Appraisal Award, including the roof and the interior work. (Id. at 92.) As stated above, Mr. Bonner explicitly stated in his expert report that the 120-day estimation was only for the roof repairs. He made this distinction clear in his deposition as well, where he testified that, in his own opinion of what repairs would be needed, the total time for both the roof repairs and the interior repairs would be 240 days, comprised of 120 days for each the roof and the interior work, and these repairs could not be done concurrently. (Id. at 73; 76-77.)

Accordingly, the Court **GRANTS** Plaintiff's motion to exclude to the extent it seeks to exclude Mr. Bonner's opinion that the roof repairs would take an estimated 120 days because this opinion was not based upon the Appraisal Award. The Court, does not, however exclude Mr. Bonner's opinions in their entirety. Mr. Bonner did review the Appraisal Award and he relied on the evidence of this case in his deposition when he gave various estimates of time for repairs pursuant to the Appraisal Award. Mr. Bonner's opinions based on the Appraisal Award are not excluded.

13

C. <u>Plaintiff's Motion to Exclude Testimony and Report of Dwain Begitschke</u>

In his expert report, Dwain Begitschke offers an opinion that "Dia Suri, LLC suffered a loss of revenue in the sum and amount of Three Hundred Twenty-Six Thousand, Six Hundred Eighty-Eight Dollars ($326,688.00) from July 1, 2017 through December 31, 2017 because of physical damage caused by Hurricane Matthew." (Doc. 22 at 2.) Plaintiff first argues that Begitschke is not qualified to opine on "loss of business income" because he is a tax accountant with no experience in forensic accounting and/or determining "loss of business income." (Doc. 31, Attach. 1 at 7-8.) Plaintiff argues that Begitschke does not have the appropriate experience in calculating loss of business income for insurance purposes. (<u>Id.</u> at 9.) In response, Defendant argues that Begitschke is qualified because of his education, training, and experience even in absence of specific experience in calculating business income claims. (Doc. 41 at 9.) Defendant also argues that Begitschke's experience as an accountant qualifies him to opine on business income because, in preparing tax returns, he reviews and analyzes business income. (<u>Id.</u> at 11.)

First, the Court finds Plaintiff's motion is misplaced because Begitschke's deposition and expert report make it clear that, while his opinion goes to support Defendant's loss of business income claim, he is not opining on the lost business

14

income itself. Begitschke stated in his deposition that he was retained to offer an opinion on loss of **revenue**, not loss of income. (Doc. 37 at 8-9.) Second, Begitschke clarified the scope of his opinion (e.g. revenue versus net income) in his deposition as follows:

> Q. Let's talk about what's the difference between revenue and income are.
> A. Yeah, that's what -- that's -- we got to clarify that.
> Q. Okay. So --
> A. Whenever you say income, I'm thinking of net income. I'm thinking of the bottom line. I'm thinking of revenue minus expenses gets you the net income. That seems to be what people is always worried about 'cause you pay taxes on it or if somebody is going to evaluate your company, that's what they're going to look at. . . .

(Doc. 37 at 31-32.) Elsewhere, Begitschke testifies:

> Q. So business income is not just revenue; it's revenue less expenses?
> A. Correct. When you keep saying "income," I'm thinking net income. That's what I'm thinking of.
> Q. Correct and that is -- that is the - is that standard in the industry that businesses income is revenue less expenses?
> A. Yes. If it -- people say their gross revenue, gross profit, which is after your direct expenses and usually your administrative expenses, it get down to your net income.

(Id. at 33.) Begitschke's expert report states that he is opining on the loss of revenue. (Doc. 22 at 3.) As made clear in his deposition, revenue and net income are different sums. Thus, the fact that Begitschke did not give an opinion of loss of income does not render him unqualified to offer an opinion on the loss of revenue for Defendant during a certain time period.

15

Further, the Court finds that Begitscke is sufficiently qualified to offer an expert opinion in this case. Begitschke is a certified public accountant who has been a shareholder in the Cumberland Financial Group, Inc. for the last ten years. (Doc. 22, Attach. 1 at 1.) In his role at Cumberland Financial Group, Inc., Begitschke prepares business income tax returns for businesses, provides consulting for businesses on financial, tax, and management issues, and prepares income tax returns for business owners. (Id.) The Court finds that Begitscke's education and experience qualifies him to opine on loss of business revenue.

Plaintiff further contends that Begitschke's testimony must be excluded as irrelevant and unreliable. (Doc. 31, Attach. 1 at 10.) Plaintiff contends that

> the policy provides that loss of business income is revenue less "continuing operating expenses." Simply providing the jury the revenue portion of this calculation does not assist them in understanding the evidence, because the lay jury is in no way qualified to calculate, on its own, the "continuing operating expense" which must be deducted from revenue in order to calculate "loss of business income."

(Doc. 47 at 5-6.) The Court disagrees. By Plaintiff's own admission, "to complete a calculation on loss of business income, one must calculate revenue as a portion of the complete calculation." (Id. at 6.) Plaintiff attempts to exclude Begitschke's opinion because it does take the next step of actually deducting continuing operating expenses from revenue to reach loss

16

of business income. The fact that Begitschke did not offer an opinion of loss of business income does not render his opinion of loss of revenue unreliable or unhelpful to the jury as Plaintiff itself recognizes that loss of revenue is a key element in the calculation of loss of income. Moreover, any issues with Begitschke's opinion being limited to just one part of the whole "calculation" to arrive at loss of business income can be explored on cross-examination. "Cross-examination and the presentation of contrary evidence 'are the traditional and appropriate means of attacking shaky but admissible evidence.' " Sorrels v. NCL (Bahamas) Ltd., 796 F.3d 1275, 1285 (11th Cir. 2015) (quoting Daubert, 509 U.S. at 596, 113 S. Ct. at 2786).

## CONCLUSION

For the foregoing reasons, Plaintiff's Motion to Strike Defendant's Brief in Opposition to Plaintiff's Motion to Exclude (Doc. 42) is **DENIED**, Plaintiff's Motion to Exclude Testimony and Report of Fred Bonner (Doc. 30) is **GRANTED IN PART** and **DENIED IN PART**, and Plaintiff's Motion to Exclude Testimony and Report of Dwain Begitschke (Doc. 31) is **DENIED**.

SO ORDERED this __10th__ day of September 2020.

_____
WILLIAM T. MOORE, JR.
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA